# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-1511


**STATE OF LOUISIANA**

**VERSUS**

**CONNOR L. WOOD**


\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 07-0594/0594A/0594B
HONORABLE LEO BOOTHE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

## MICHAEL G. SULLIVAN
## JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Michael G. Sullivan, Billy Howard Ezell, Judges.


**AFFIRMED.**

**Bradley R. Burget**
**District Attorney**
**4001 Carter Street, Suite 9**
**Vidalia, Louisiana  71373**
**(318) 336-5526**
**Counsel for:**
    **State of Louisiana**

**W. Jarred Franklin**
**Louisiana Appellate Project**
**3001 Old Minden Road**
**Bossier City, Louisiana  71112**
**(318) 746-7467**
**Counsel for Defendant/Appellant:**
    **Connor L. Wood**

**SULLIVAN, Judge.**

On May 7, 2007, Defendant, Connor L. Wood, was charged by three grand jury indictments with the March 14, 2007 murders of his parents, John and Geraldine Wood, and his alleged co-conspirator, Matthew Whittington. The indictments, which each originally charged Defendant with first degree murder, were amended by the State in March of 2008 to charge Defendant with second degree murder. After a jury trial, Defendant was convicted of the charged offenses and was subsequently sentenced to three consecutive life sentences at hard labor without the benefit of parole, probation, or suspension of sentence.[1]

Defendant appeals, contending that the evidence was insufficient to convict him and that his sentences are excessive. For the following reasons, we affirm.

## FACTS

### Initial Response to the Scene

David Cobb, an employee in the communications department of the Concordia Parish Sheriff's Office (CPSO), testified that at approximately 2:55 a.m. on March 14, 2007, he received a phone call from Defendant stating that someone had broken into his house at 119 Shady Lane and shot his parents and that he thought his parents were dead. Defendant informed Cobb that he had shot the intruder but that he thought the intruder may still be alive. Cobb contacted the Ferriday Police Department and provided the details to Lieutenant (then Sergeant) John Hawkins and dispatcher Elbert White. When Cobb returned to his phone conversation with Defendant, Defendant told him he had shot the intruder again and that he was dead. The phone

---

[1]Defendant was fifteen years old at the time of the murders. Louisiana Children's Code Article 857 provides for the transfer for prosecution to the appropriate criminal court of a child who is fourteen years or older at the time of the commission of certain enumerated alleged offenses, including first and second degree murder.

1

call between Defendant and Cobb ended when Hawkins arrived at the scene. The call, which had come in on the regular phone system rather than the 911 system, was not recorded.[2] However, the conversations between Cobb and Hawkins and Cobb and Elbert White were recorded.

Lt. Hawkins testified that he and Lt. Derrick Freeman went to Defendant's residence. When Hawkins arrived at the scene, he saw Defendant walking out from the carport area with a cell phone in his hand. Hawkins described Defendant as "sort of hysterical" upon his arrival. Freeman described Defendant as nervous, "as if he had something on his mind." Defendant told Hawkins that his mother and father were inside the residence and that the intruder "had entered the room and he shot the intruder down in the hallway." At this point, Hawkins placed Defendant in his patrol car for safety reasons because he did not know whether the intruder was dead or alive. Hawkins and Freeman secured the perimeter of the house, and Deputies Phillip Webber, Jack Fletcher, and Edward Lawrence arrived and entered the home.

In compliance with standard policy, Defendant was advised of his rights at the scene. He was then questioned to obtain information regarding his family and persons to contact. Defendant provided Hawkins with the names of his parents, John and "Jerri" Wood, and his friend, Matthew Whittington, who was the "intruder" in the home. Defendant also provided them the name of his brother, Hudson, a student at Louisiana Tech University in Ruston. Defendant was removed from Hawkins' patrol car and turned over to Investigator David Hedrick. Hedrick testified that he arrested Defendant for the murders at 12:40 p.m. on March 14, 2007.

---

[2]Cobb testified that approximately one-half of the 911 calls dialed from cell phones come into the regular phone system rather than the 911 phone system.

2

Investigator (then Sergeant) Fletcher testified that, shortly after he arrived on the scene, he approached Defendant and asked what had happened. Fletcher testified that Defendant was acting normal. Defendant told Fletcher that he heard two shots while he was in his bedroom. He went and retrieved a weapon from under the mattress in his parents' bedroom and then met an intruder in the hall, whom he shot. Defendant said he told the 911 dispatcher that the intruder was still moving around and asked the dispatcher if he could shoot again. Defendant said he shot the intruder again. Defendant told Fletcher that, after he shot the intruder, he went to his father's vehicle to retrieve another weapon.

**Evidence Obtained from the Scene and from Subsequent Investigation**

While waiting for Deputies Webber and Lawrence to arrive, Fletcher looked in the back door of the residence and saw a person lying in the hallway. Fletcher testified that the back door was open, a window was shattered, and there was glass on the floor inside the residence.[3] There was also a jacket on the ground in front of the door with glass fragments in it. Once Webber and Lawrence arrived, the three entered the house. The person in the hallway was laying face down, with no signs of life. Defendant's mother and father were in their bed with no signs of life. Two Emergency Medical Technicians (EMTs) arrived and confirmed that all three individuals were deceased.

Fletcher asked the EMTs to check Defendant for injuries. Defendant then told Fletcher that he needed to tell him something. Fletcher told Defendant that he needed to secure the residence and that the investigator would be there in a minute, but Defendant blurted out, "Well we had taken the guns out to shoot them last weekend

---

[3]Fletcher was apparently referring to broken glass from the back door as depicted in State's Exhibit #13, which was referenced during his testimony.

so my fingerprints will be all over the guns in the house." According to Fletcher, at this point, Defendant "seemed normal" and "[w]asn't really upset a whole lot."

When Fletcher returned to the rear door, he realized that only the outer pane of glass was broken. He observed a hammer on the barstool near the glass door and a 9 mm pistol on the bar between the refrigerator and the entrance to the dining room. Lawrence testified that the gun had a round in the chamber and several in the magazine.

Matthew Whittington's body was found in the hallway with empty shell casings (both .22 and .32 caliber) around him.[4] He had neoprene camouflage gloves on his hands. The bodies of John and Geraldine Wood were found in their bed. There were multiple 9 mm casings found throughout the room, with a bullet in the wall behind the headboard of the bed. There was an empty magazine from a 9 mm pistol laying on the floor between the night table and the bed. Fletcher testified that a .22 caliber rifle and a .32 caliber pistol[5] were found on Defendant's bed. Lawrence testified that the .32 caliber pistol still had the magazine in it but was empty and that the .22 caliber rifle had a live round in the chamber and rounds in the magazine.

Captain Frankie Carroll testified that he found a purse and some money on a chair in the kitchen, which indicated to him that a robbery did not occur. According to Carroll, he dusted for fingerprints on the door and in the bar area. The only print that had ridge detail was on the door, but when he lifted it, it had no identifiable ridge detail. Chief Investigator, Bobby Ray Sheppard, testified that an investigator checked other exterior doors and windows and found no sign of entry into the home.

---

[4]Matthew was sixteen years old at the time of his death.

[5]Lawrence testified that the .22 caliber rifle was a Ruger 1022 that appeared to be modified to look like an assault weapon. The pistol recovered from Defendant's bed was a Beret Model D 7.65 caliber that shot a .32 caliber round.

Deputy Lawrence testified that he collected seven .32 caliber casings and two .22 caliber casings laying near Matthew's body and two .32 caliber casings in a nearby bathroom. He collected a total of thirteen 9 mm casings inside Mr. and Mrs. Woods' bedroom. Captain Carroll testified that five bullet fragments were recovered from each of the bodies of Defendant's parents and nine bullet fragments were recovered from Matthew's body. A cell phone and gloves were removed from Matthew's body at the funeral home.

Sheppard and Evans, after initially responding to Defendant's residence, proceeded to the Whittington home where they informed Mr. and Mrs. Whittington that their son had been shot and killed. Mr. Whittington began calling his son's name and attempted to enter into Matthew's bedroom but was unable to do so. The Whittingtons explained that their house was being renovated and that Matthew secured his doors with poles when he went to bed. Mr. Whittington entered his son's room by going outside and raising the window. Once inside Matthew's room, Sheppard observed Matthew's wallet and a leg/knee brace on the top bunk bed. He also saw crutches inside the room. Evans testified that he was informed by the Whittingtons that Matthew had a knee injury and was not supposed to be walking and that he needed the brace and crutches when he was walking.

Sheppard conducted a follow-up investigation six days after the incident occurred. He searched the red Nissan truck that had been parked in the Woods' driveway the night of the incident, which had been subsequently released to Mr. Wood's brother. In the truck, Sheppard found a clip for a .22 caliber weapon, three boxes containing .22 caliber bullets, a case for a 9 mm Jiminez Arms handgun, and a box containing two cartridges of 9 mm ammunition. Other ammunition was

5

found in the center console of the truck, and a Remington pump shotgun was recovered.

Max Jackson, an eleventh grade student at Huntington High School, testified that he was friends with both Defendant and Matthew and that he spent a lot of time at Matthew's house. Max testified that to his knowledge, Matthew was not a hunter, and he never saw any kind of hunting equipment in Matthew's residence. Max testified that he had been deer hunting with Defendant, and he identified the Under Armor camouflage gloves found on Matthew's body as some he had seen Defendant wearing when they went hunting in the 2006-2007 hunting season. Max explained that the gloves are distinctive because they are so thin.

**Forensic Evidence**

Dr. Karen Ross, an assistant coroner and a forensic pathologist at the Jefferson Parish Coroner's Office, was qualified as an expert in the field of forensic pathology. She testified that Matthew received a gunshot wound to the face from a medium caliber bullet that went through the sinuses and into the base of the skull.[6] The presence of stippling or abrasion marks around the entrance wound indicated that the gun was fired from less than three feet away. On the right side of the back of his head, there were two gunshot wounds made by small caliber bullets. There was also a graze-type wound on the back of the head. There was another wound on the right side of the back made by a medium caliber bullet. The fifth wound examined by Dr. Ross was made by a medium caliber bullet and was in the left side of the back.[7] Wounds four and five were likely made while Matthew was bending over. The sixth

---

[6]Dr. Ross testified that she deferred to the firearms examiner with regard to identification of the bullets. Her reference to medium meant the wound was made by a "nine millimeter or something in the 30s and small is like 22, 25."

[7]Dr. Ross explained that when she describes wounds, she does so in no specific order.

6

wound was in the left upper buttock and was made by a medium caliber bullet. The seventh and eighth wounds were in the right upper buttock and were made by a medium caliber bullet. The ninth wound was below the seventh and eighth wounds that Dr. Ross examined, and it was made with a medium caliber bullet. The path of wounds two through nine traveled back to front. Dr. Ross noted that Matthew had a big bruise on the back of his left leg with an ace bandage around it.

Dr. Ross's examination of Geraldine Wood's body revealed a gunshot wound just below the right eye which exited the left temple. Stippling was found on this wound, indicating firing from one and one-half to three feet. A second entrance wound was located on the right lower jaw. The medium caliber bullet was recovered from the left side of the base of the skull. Scant soot and powder particles were found on this wound, indicating the weapon was fired from perhaps within six inches. The third, fourth, fifth, and sixth wounds examined by Dr. Ross revealed the bullets, which were medium caliber, traveled right to left. Wounds seven and eight were through the right arm and nine and ten were through the left arm. Wounds eleven and twelve were in Mrs. Wood's shoulder. There were also several graze wounds and a couple of lacerations. From the location of the entrance wounds, Dr. Ross opined that Mrs. Wood was lying on her left side "with her back open."

Dr. Ross testified that it is very likely that some of the bullets pierced Mrs. Wood's body and then entered the body of Mr. Wood. The first wound Dr. Ross examined on Mr. Wood was on the right cheek, and the second was on the right side of the neck. The third wound was to the right lower back, and the fourth went from the back of the right shoulder to the front of the body. The second and third wounds examined by Dr. Ross were made by a medium caliber projectile. The fifth wound

7

went through from the back to the front of the right arm and then entered and exited his chest. Wounds six and seven entered the right upper back and were made by a medium caliber projectile. The final wound on Mr. Wood was on the back of his right hand. The cause of death for each of the three victims was multiple gunshot wounds, and the manner of death was homicide.

**Firearm and Fingerprint Analysis**

Mike Stelly of the North Louisiana Crime Lab was qualified as an expert in the field of firearm and latent fingerprint analysis. He testified that no latent prints of value could be detected on the Jimenez Arms 9 mm pistol, the pistol magazine, the 9 mm cartridges, or a second empty 9 mm magazine. No latent prints could be detected on the thirteen fired 9 mm casings. The empty pistol magazine found in the Woods' bedroom fit into the 9 mm pistol.

Stelly testified that two of the bullets retrieved from the body of Mrs. Wood had positively been fired from the 9 mm Jiminez Arms pistol. Two of the 9 mm bullets were damaged and could not be positively said to have come from the Jiminez Arms pistol, and the final lead fragment retrieved from her body was too badly damaged for identification.

The bullets retrieved from Mr. Wood were also analyzed. Two were determined to have been fired from the 9 mm Jiminez Arms pistol, but two retained insufficient individual markings for a determination that they positively came from that pistol. One item retrieved from Mr. Wood's body was consistent with the weight and diameter of a 9 mm bullet core, but it could not be said to have come from a particular gun. Bullets retrieved from the hallway and from the wall of the bedroom

8

were consistent with being 9 mm bullets, but could not be conclusively said to have come from the Jiminez Arms weapon.

Stelly also analyzed the 7.65 mm MAB pistol and its magazine. Latent fingerprints could not be detected. He explained that .32 auto caliber cartridges fit this gun and the two fired .32 caliber cartridge cases retrieved from the bathroom had been fired from this weapon. The seven fired .32 caliber cartridge cases retrieved from the hallway were also fired from this weapon. Six bullets retrieved from Matthew's body were determined to have come from this weapon. A bullet core retrieved from Matthew's body was consistent with a .32 caliber bullet but was unsuitable for comparison.

A .22 caliber Ruger rifle, Model 1022, a magazine containing nineteen .22 caliber bullets, and one loose bullet were also submitted to Stelly for analysis. No latent prints of value could be detected on the magazine and cartridges. No prints could be detected on the two fired .22 caliber cartridge cases, but it was determined they were fired from the Ruger rifle. The two bullets recovered from Matthew's body were determined to have the same class characteristics as the Ruger rifle but, due to damage, retained insufficient individual markings to conclusively determine whether they came from that weapon. Stelly also analyzed three boxes of various types of ammunition retrieved from Defendant's bedroom table, but latent prints could not be detected on the boxes.

**Defendant's Statements**

*March 14, 2007 Statement*

Investigator Hedrick testified that he transported Defendant from the scene of the murders to the Sheriff's Office to wait for his brother, Hudson, to come in from

9

Ruston.  Prior to their arrival at the office, Defendant told Hedrick that he needed to tell him something and that he wanted to talk to Hedrick and no one else.  Hedrick advised him he could not say anything until his guardian got there.  Hudson gave his permission for Defendant to speak to Hedrick alone.  Defendant indicated that he would feel more comfortable with the recording equipment off; thus, Hedrick left the equipment off and conducted a pre-interview that lasted approximately thirty-five minutes.

After the pre-interview, Defendant gave a recorded statement after being advised of and waiving his constitutional rights.  Therein, Defendant stated that a few months ago, his parents were arguing a lot, and he dreaded his father's return on Wednesday nights and weekends.  He told his best friend Matthew about it, and a couple of weeks later, Matthew suggested killing them.  Defendant was shocked and did not say anything, but as time went by, Matthew brought it up more and became more serious, explaining how he would do it.  The more Matthew talked about it, the more convinced Defendant became that it was all right to do it.  Then, Defendant began to want to do it also, and they decided, after about a month and a half, that they would carry out the murders.

Someone had slashed the tires on Mr. Wood's truck, so he had been taking his guns out of his truck and keeping them in the kitchen.  Matthew knew this and suggested that they could use those guns.  After deciding they were going to go through with the plan, Defendant called Matthew one night, and they talked about it.  Matthew said he needed to wait for his father to go to sleep before he could go over to Defendant's house.  A little while later, Defendant called back, and Matthew said he was about to leave his house.  Defendant met Matthew in his backyard.  They had

10

planned for Defendant to shoot his parents and for Matthew to break the window and open the door. Defendant was to then give Matthew the gun, and he was to leave so it would look like someone else committed the crimes. When Defendant met Matthew outside, he said, "Matt, I don't want to do this." Matthew said, "Why not, we went through all this trouble and now you're changing your mind." Defendant said he told Matthew, "No, I just don't want to shoot them." Matthew said, "Well, fine, I'll do it then." They then went inside, and Defendant went to his room and stood there while Matthew entered the Woods' room.[8] As Matthew started shooting, Defendant started "freaking out." Defendant said he could not believe what he (Defendant) had just done. After shooting the Woods, Matthew walked back by Defendant's bedroom on his way to break out the window to make it look like a break-in. Defendant said he started "freaking out" and went down the hall and retrieved the gun his mother kept under the mattress. As Matthew was coming back to tell Defendant that he was done and was about to leave and Defendant was about to call the police, Defendant "just shot" Matthew.[9] He emptied the clip and then ran in his room, called 911, and turned on the lights. Matthew was on the floor and still had the gun in his hand. Defendant said he knew Matthew still had bullets, and he was moving around. Defendant then told the 911 operator that the person was still alive and had a gun, and he asked twice if he could kill him. After not answering, Defendant asked a third time, and the man said, "Yes, you can kill him." By this point, Defendant had retrieved another gun, and he shot Matthew in the back of the head. A few minutes later, the police arrived. Defendant said he was still "freaking

---

[8]Hedrick testified that during the pre-interview, Defendant said Matthew retrieved the gun from the kitchen.

[9]Hedrick testified that during the pre-interview, Defendant said he shot Matthew out of anger.

out" when the police arrived because he could not believe he let Matthew kill his parents.

When asked why they did this, Defendant said he did not know. He commented that his dad "was real down sizing to me when other people were around." When the two of them were alone, things were fine, but when other people were around, his dad would embarrass and make fun of him. He said his mom limited what he could do, and he was not allowed to go anywhere with his friends. Defendant said he would not have done it if it had not been for Matthew convincing him that he had a good plan. Defendant said he understood you can overcome peer pressure, and he felt stupid for not doing so.

### March 17, 2007 Statement

On March 17, 2007, Hedrick was at home and was informed that Defendant wished to speak to him. Hedrick went to the correctional facility, and Defendant told him he wanted to speak to him. Hedrick advised Defendant of his rights, and they went to the Sheriff's Office. After being advised of and waiving his rights, Defendant again spoke to Hedrick and told him that his last statement was not completely true. He said everything was true up to the point he called Matthew, Matthew came to his house, and they met outside. When Defendant met Matthew outside, Defendant told Matthew that he did not want to do it, and Matthew asked, "Do you want me to kill them?" Defendant replied, "No, I really don't want them dead." They talked about it for a minute and then went inside. Matthew picked up the gun, and Defendant said, "No, no, I don't want you to do it." Matthew said, "I'm not, we just don't want to have to come back in here later and get this, already have it." They then went to Defendant's room, and Matthew reminded Defendant of all the things he had been

telling Matthew about why he wanted his parents dead. Matthew told Defendant his life would be better, and neither of them would get caught. Defendant then took the gun from Matthew and went in and shot his parents. He then gave the gun to Matthew, and Matthew went to break the window. Defendant explained, "[I]t was like I was somebody else. It felt like I didn't really just do that. And I wished I wouldn't had done it and I just got so mad, I just, extremely mad at Matt because I felt like he had done it." Defendant then retrieved the gun his parents kept under their mattress, and he met Matthew in the hall. Defendant said he did not think Matthew knew he had the gun. Defendant then said:

> And he was telling me it's going to be better, everything's all right. You've done it, it's over. You life's going to be better, you know. You're not going to have to deal with them anymore and all this.
>
> And I was telling him it's not going to be better. I just killed somebody. I didn't want to kill them. And he says, I promise it's going to be better and I was just so mad at him I just shot him. And I called the cops.

Hedrick then asked specific questions of Defendant. Defendant said he had called Matthew twice on his cell phone that morning, and they decided they were going to do it. Matthew arrived around 2:15 a.m., and Defendant did not think Matthew brought anything from his residence. Defendant said he told Matthew he did not want to do it, and Matthew acted like he was mad about it. Matthew asked him if he wanted Matthew to do it, and he told Matthew that he "didn't want it done." Again, Defendant said Matthew came up with the idea in the first place, made the plans, and would talk about it. Most of the time, Defendant would just listen and did not have anything to say.

Defendant told Hedrick that Matthew picked up the 9 mm gun from the kitchen, and that this gun was normally kept in his father's truck. According to

Defendant, Matthew originally planned to bring a gun from his house until he noticed that Mr. Wood had been bringing the gun in from his truck.

When Hedrick asked Defendant how many times he shot his parents, he said he did not know. He remembered changing magazines and did not know if he shot after that point. Defendant said he did not wear gloves when he shot the pistol.

Defendant told Hedrick that the gun he retrieved from under his parents' mattress was a black pistol. He said he thought Matthew fell face down after the first two or three shots, and then he emptied the clip. Defendant said he turned on the light in the hall, or his bedroom, or both and saw that Matthew was still moving. After the 911 operator told him he could kill the "intruder," he got the .22 rifle out of his parents' closet and shot Matthew in the back of the head once. Defendant then retrieved his father's truck keys from the kitchen key rack and went to the truck.

Defendant said he did not know if Matthew had gloves, but he denied giving him a pair. Defendant also said he did not know whose sweater was at the back door. He assumed that Matthew put the gun on the kitchen counter; the last time he saw it was when he handed it to Matthew.

When Hedrick asked Defendant what made him kill his parents, he stated that he started off talking to Matthew about his parents fighting. He said that Matthew had spent the night at his house on Monday night and brought up the plan on Tuesday. Mr. Wood was due to come home Tuesday night due to the water being turned off where he was staying.

Hedrick testified that Matthew's cell phone records revealed that a phone call was made from Matthew's cell phone to Defendant for one minute at 1:08 a.m. on March 14, 2007. Another one minute call was made to Defendant at 1:09 a.m. At

14

1:10 a.m., Matthew called Defendant for forty-nine minutes. Information recovered from Defendant's cell phone records indicated that Matthew called him at 1:11 a.m., and they talked for forty-nine minutes. At 2:17 a.m., Defendant called Matthew, and they talked for an undetermined amount of time. A review of phone records, computers, e-mail, My Space, and Facebook accounts, and insurance policies revealed no information regarding the existence of a one and one-half month conspiracy.[10]

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant contends that the evidence presented by the State was insufficient to convict him of the three murders. Specifically, he contends that there was insufficient evidence presented to prove that he possessed the requisite intent to kill or inflict great bodily harm on his parents. Further, he contends that he was justified in killing Matthew to protect his own life.

Louisiana Revised Statutes 14:30.1 defines second degree murder as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm."

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *King*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

---

[10]Defendant told Hedrick that he and Matthew had not sent e-mails or text messages about their plan and that no one else knew about it.

*State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27.

"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7-8 (La.1/17/07), 950 So.2d 583, 592-93, *cert. denied*, ___ U.S. ___, 128 S.Ct. 537 (2007).

Defendant claims that the State failed to prove he killed his parents while possessing the requisite intent to kill or inflict great bodily harm. He contends that the statement he gave to Investigator Hedrick on March 14, 2007, shows that he withdrew from the conspiracy to kill his parents and that Matthew acted alone in killing them. He argues that by withdrawing from the conspiracy, he no longer possessed the requisite intent to support his murder convictions. He contends that the physical evidence at the scene supports the veracity of this statement because Matthew was the only one wearing gloves and there were no fingerprints found on the guns or shell casings.

Within the context of his sufficiency argument, Defendant notes that at the time he made the second statement, he was incarcerated and charged with three murders. He claims that, considering his young age and the recent loss of his parents, he was in no frame of mind to make a statement without the advice of counsel. He claims that Hedrick should have recognized this and insisted on counsel being present. Defendant does not specifically challenge the admissibility of his statements.[11] We

---

[11]Defendant filed a pretrial writ application contending his March 14, 2007 and March 17, 2007 confessions should be suppressed. This court found no error in the trial court's ruling denying the motion to suppress. *See State v. Wood*, an unpublished writ bearing docket number 08-421 (La.App. 3 Cir. 4/11/08).

16

interpret these statements as challenging the weight of the evidence, which is a matter strictly for the jury. *Lambert*, 720 So.2d 724.

We conclude that the evidence presented by the State was sufficient to prove that Defendant possessed the requisite intent to kill or inflict great bodily harm on his parents. In Defendant's second recorded statement to Hedrick, he admitted to shooting his parents. The jury apparently chose to believe this statement over the previous statement in which Defendant labeled Matthew as the gunman, and this court will not second-guess the credibility determinations made by the jury. *Id.* The victims were shot numerous times, with multiple gunshot wounds to the upper portions of their bodies. Some of the gunshot wounds inflicted on Mrs. Wood were at very close range. Under these circumstances, the State clearly proved that Defendant possessed the specific intent to kill or inflict great bodily harm on his parents. Additionally, our interpretation of the March 14, 2007 statement does not support counsel's contention that Defendant withdrew from the conspiracy. We interpret the relevant portion of the March 14, 2007 statement to mean that Defendant did not want to do the actual shooting but that he was still an active participant in the plan for Matthew to shoot his parents, which would also support a finding of him being a principal[12] to second degree murder.

Next, Defendant claims that he was justified in shooting Matthew because it was done in self-defense immediately after Matthew shot his parents and while Matthew was still armed with a handgun. Defendant's March 17, 2007 statement reveals that he shot Matthew out of anger, not in self-defense. Further, only one

---

[12]Louisiana Revised Statutes 14:24 states, "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

17

gunshot wound was inflicted while Matthew was facing Defendant. The remaining eight gunshots traveled through Matthew's body from back to front, some while he was bending over. Under these facts, there is nothing to suggest that the killing of Matthew was in self-defense. For the foregoing reasons, Defendant's three convictions are affirmed.

## ASSIGNMENT OF ERROR NUMBER TWO

Defendant contends that the mandatory life sentences imposed upon him are grossly disproportionate to the crimes committed and represent nothing more than needless pain and suffering. Defendant further contends that the imposition of consecutive sentences added to the needless imposition of pain and suffering. He notes that although La.Code Crim.P. art. 883 allows a judge to impose consecutive sentences for two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, in this case, the trial court cited no reason or basis for doing so.

At sentencing, the State requested imposition of consecutive sentences, while Defense argued they should be concurrent. The sentencing transcript reveals that on each count, the trial court imposed a mandatory life sentence at hard labor without the benefit of probation, parole, or suspension of sentence. On each, he ordered the term to be consecutive to any other sentence Defendant may be serving. No oral objection was raised concerning the sentence imposed by the trial court. The trial court allowed Defendant twelve months from the date of sentencing, April 30, 2008, to file a motion to reconsider sentence. The record contains no indication that such a motion was ever filed.

18

In some instances when a motion to reconsider sentence is not filed, this court has held that the defendant is barred from raising an excessive sentence claim. *State v. Bourque*, 99-1625 (La.App. 3 Cir. 6/21/00), 762 So.2d 1139, *writ denied*, 00-2234 (La. 6/1/01), 793 So.2d 181. However, this court has also reviewed claims of bare excessiveness in the interest of justice. *State v. Davis*, 06-922 (La.App. 3 Cir. 12/29/06), 947 So.2d 201; *State v. Runyon*, 06-823 (La.App. 3 Cir. 12/6/06), 944 So.2d 820, *writ denied*, 07-49 (La. 9/21/07), 964 So.2d 330; *State v. Jeansonne*, 06-263 (La.App. 3 Cir. 5/31/06), 931 So.2d 1258; and *State v. Graves*, 01-156 (La.App. 3 Cir. 10/3/01), 798 So.2d 1090, *writ denied*, 02-29 (La. 10/14/02), 827 So.2d 420.

In the interest of justice, we will proceed with a review of Defendant's sentences for constitutional excessiveness, including their consecutive nature. *See State v. Baker*, 08-54 (La.App. 3 Cir. 5/7/08), 986 So.2d 682; *Davis*, 947 So.2d 201; and *State v. Vollm*, 04-837 (La.App. 3 Cir. 11/10/04), 887 So.2d 664.

Defendant received three mandatory life sentences as required by La.R.S. 14:30.1. In *State v. Ross*, 03-564 (La.App. 3 Cir. 12/17/03), 861 So.2d 888, *writ denied*, 04-376 (La. 6/25/04), 876 So.2d 829, the defendant argued that his mandatory life sentence was excessive. In finding no merit to the defendant's claim, this court stated:

> In *State v. Paddio*, 02-0722, pp. 16-17 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, 1131, [*writ denied*, 03-402 (La. 2/13/04), 867 So.2d 682,] this court explained:
>
>> [A] sentence, although within the statutory limit, is considered to be excessive if "the penalty is grossly out of proportion to the severity of the crime or if it is nothing more than the purposeless and needless imposition of pain and suffering." *State v. Kitchen*, 94-0900, p. 3 (La.App. 3 Cir. 2/1/95), 649 So.2d 1227, 1229, *writ denied*, 95-0537 (La.6/23/95), 656 So.2d 1012 (quoting *State v. Bonanno*, 384 So.2d 355, 357 (La.1980)). A mandatory life sentence

19

is not per se unconstitutional. *Richardson v. La. Dept. of Public Safety and Corrections*, 627 So.2d 635 (La.1993). However, a trial court has the authority to determine whether a mandatory minimum sentence is constitutionally excessive as applied to a particular defendant. *State v. Dorthey*, 623 So.2d 1276 (La.1993). Further, this review extends to all mandatory minimum sentences and not just those imposed under the habitual offender law. *State v. Fobbs*, 99-1024 (La.9/24/99), 744 So.2d 1274.

Nevertheless, a court may depart from a minimum sentence only if it finds that there is clear and convincing evidence that rebuts the presumption of constitutionality. *State v. Lindsey*, 99-3256, 99-3302 (La.10/17/00), 770 So.2d 339, *cert. denied*, 532 U.S. 1010, 121 S.Ct. 1739 (2001). To rebut the presumption, a defendant must show, by clear and convincing evidence, that, "because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." *State v. Johnson*, 97-1906, p. 8 (La.3/4/98), 709 So.2d 672, 676 (*quoting from Judge Plotkin's concurrence in State v. Young*, 94-1636, pp. 5-6 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 531, *writ denied*, 95-3010 (La.3/22/96), 669 So.2d 1223). (citations omitted).

In *State v. Johnson*, 97-1906, p. 9 (La.3/4/98), 709 So.2d 672, 677, the supreme court explained:

We emphasize to sentencing judges that departures downward from the minimum sentence . . . should occur only in rare situations. As Chief Justice Calogero noted in a prior case:

The substantive power to define crimes and prescribe [sic] punishments lies in the legislative branch of government. [citation omitted]. Our decision in *State v. Dorthey*, 623 So.2d 1276 (La.1993), did not purport to grant a district court the power to usurp that legislative prerogative or to impose what the court believes is the most appropriate sentence for a particular offender in a particular case. *Dorthey* gives the district court the authority to depart from the mandatory minimum sentences provided by the legislature only in those relatively rare

> cases in which the punishment provided violates the prohibition of La. Const. art. I, § 20 against excessive sentences. (citations omitted).
>
> In this case, the Defendant has failed to prove by clear and convincing evidence unusual circumstances that demonstrate that this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. Furthermore, the Defendant failed to prove any unusual circumstances warranting a departure from the mandatory minimum sentence provided by the legislature. Consequently, this court finds that the sentence imposed upon the Defendant is not constitutionally excessive.

*Id.* at 897-98 (first alteration added).

Here, Defendant failed to meet his burden of proving that the sentences imposed upon him are constitutionally excessive. Given the senselessness of the three murders, we cannot say that the imposition of three consecutive life sentences at hard labor without benefits is grossly disproportionate to the offenses committed by Defendant. Accordingly, this portion of Defendant's argument has no merit.

Louisiana Code of Criminal Procedure Article 883 provides: "If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively." In *State v. Pierre*, 02-277 (La.App. 3 Cir. 6/11/03), 854 So.2d 945, *writ denied*, 03-2042 (La. 1/16/04), 864 So.2d 626, the defendant shot her estranged husband and child before turning the gun on herself. She and her husband survived; their son died. The defendant was convicted of second degree murder, for which she was sentenced to the mandatory sentence of life imprisonment, and attempted second degree murder, for which she received a hard labor sentence of ten years. At the sentencing hearing, the defendant raised the issue of whether her sentences should be

21

served concurrently or consecutively; a written motion to reconsider sentence was not filed.[13]  This court considered whether the trial court erred in imposing consecutive sentences for offenses arising from a single course of conduct and found no merit to the defendant's claim.  We stated:

> This court has held that when the trial court has no discretion to deviate from a legislatively mandated sentence, failure to articulate reasons as generally required by La.Code Crim.P. art. 894.1 is not an error since it would be futile to do so at sentencing, unless the sentences are constitutionally excessive. *State v. Williams,* 445 So.2d 1264 (La.App. 3 Cir.), *writ denied,* 449 So.2d 1346 (La.1984) and *State v. Dorthey,* 623 So.2d 1276 (La.1993). *See also, State v. Armstrong,* 32,279 (La.App. 2 Cir. 9/22/99); 743 So.2d 284, *writ denied,* 99-3151 (La.4/7/00), 759 So.2d 92.

> In a case such as the instant case, where one of the sentences was a mandatory sentence and the other a mandatory minimum sentence, the Defendant has the burden to rebut the presumption that the sentences are unconstitutional by clear and convincing evidence, showing that:

> > [she] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstance of the case.

> *State v. Young,* 94-1636, pp. 5-6 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 531, *writ denied,* 95-3010 (La.3/22/96), 669 So.2d 1223.

> Defendant has failed to meet her burden of showing how she is exceptional under the circumstances. Except for reciting the law regarding the general requirements for an adequate sentencing procedure, Defendant does not give any reason why her consecutive sentences are excessive.

> Furthermore, even though the shootings of her husband and son arose out of the same act, it is not mandatory that the sentences be served concurrently.  In *State v. Bibb*, 626 So.2d 913 (La.App. 5 Cir.1993), *writ denied*, 93-3127 (La.9/16/94), 642 So.2d 188, the

---

[13]In the original appeal, this court vacated the defendant's convictions and sentences, finding she did not knowingly and intelligently waive her right to a jury trial.  The supreme court reversed, reinstated the defendant's conviction and sentence, and remanded the case to this court for consideration of the defendant's remaining claims. *State v. Pierre*, 02-2665 (La. 3/28/03), 842 So.2d 321.

defendant killed his two children. The court affirmed the two consecutive life sentences. The court noted:

> Herein, the two murders, though occurring close in time and place, are separate and distinct acts that justify consecutive sentences. Further, even assuming that the murders were close enough in time and place to be considered "same act" crimes which arise from a single course of conduct, we find that the trial court did not err in imposing consecutive sentences. Article 883 permits the court to impose consecutive sentences if the court "expressly directs" such sentences.

*Id*. at 940.

> Thus we find the trial court did not err when it ordered the sentences to be served consecutively.

*Id.* at 954.[14]

We conclude, as we previously did in *Pierre,* that it was not improper for the trial court to impose consecutive sentences. Furthermore, in *State v. Dunbar*, 94-1492 (La.App. 3 Cir. 5/31/95), 657 So.2d 429, this court noted that any error committed by the trial court in imposing consecutive sentences to a defendant sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence was harmless. Thus, even if the trial court did err in imposing consecutive sentences, pursuant to *Dunbar,* the error would be harmless.

Finally, Defendant claims that the trial court did not cite any reasons or basis for ordering consecutive sentences. In *State v. Robinson*, 07-1424, p. 11 (La.App. 3

---

[14]In *Bibb*, the defendant was sentenced to serve two life sentences without benefit of parole, probation, or suspension of sentence following the jury's inability to reach a unanimous verdict as to the penalty for the two counts of first degree murder. Although not mentioned by this court in *Pierre*, the court in *Bibb* noted that the sentencing judge stated that the murders were the most heinous crimes he had ever seen. The fifth circuit, in holding that consecutive sentences were not excessive, noted that the crimes were particularly heinous because they involved two young children and because of the manner in which they were killed.

Cir. 4/30/08), 981 So.2d 867, 875, *writ denied*, 08-1314 (La. 2/13/09), 999 So.2d 1144, this court held:

> Defendant argues that the trial court erred by failing to articulate the factors it used in formulating the sentence, and in determining the sentences should run consecutively.
>
> This court observes that Defendant did not object to the sentences and did not file a motion to reconsider sentence. Although he cites jurisprudence regarding excessive sentences, he does not argue that his sentences are excessive in length. Therefore, his claim regarding La.Code Crim.P. art. 894.1 has not been preserved for review. La.Code Crim.P. art. 881.1.
>
> Defendant also argues that the trial court erred by failing to sufficiently explain why it ordered that the sentences run consecutively. However, this court finds this argument should not be considered, for the reasons noted in the previous paragraph.

As in *Robinson*, Defendant did not object to his sentences nor file a motion to reconsider sentence. Accordingly, this portion of Defendant's claim will not be considered.

## **DECREE**

For the foregoing reasons, Defendant's convictions and sentences are affirmed.

**AFFIRMED.**