832 So.2d 1120 (2002)
STATE of Louisiana
v.
Susie PADDIO.
No. 02-722.
Court of Appeal of Louisiana, Third Circuit.
December 11, 2002.
*1122 Michael Harson, District Attorney, 15th JDC, Lafayette, LA, for State of Louisiana.
Edward Kelly Bauman, LA Appellate Project, Lake Charles, LA, for Susie Paddio.
Court composed of HENRY L. YELVERTON, OSWALD A. DECUIR, and ELIZABETH A. PICKETT, Judges.
YELVERTON, J.
The Defendant, Susie Paddio, was charged by grand jury indictment dated November 17, 1999, with the offense of second degree murder, a violation of Louisiana Revised Statute 14:30.1. On November 27, 2001, the Defendant was tried by a jury and was found guilty as charged on November 28, 2001. On December 17, 2001, the Defendant was sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. The Defendant filed a motion to reconsider sentence on December 17, 2001, which was denied by the trial court, with written reasons issued on February 25, 2002. From this conviction and sentence, the Defendant now appeals, alleging three assignments of error.

FACTS
On September 5, 1999, officers from the Lafayette Parish Sheriff's Office were called to 210 Marigny Circle, Apartment B, in Duson, Louisiana, to investigate a domestic disturbance. Upon arrival, officers found the victim, Mr. Roland Roy, lying dead on the floor of the master bedroom, with a substantial amount of blood on his left shoulder and a large kitchen knife lying nearby. The Defendant, and her two children, ages seven and nine years, lived with the victim for approximately a year and nine months. The Defendant was present at the scene, covered in blood, and she admitted that she stabbed the victim. She was transported to the Lafayette Parish Sheriff's Office for interrogation. The Defendant waived her rights and gave a videotaped statement, during which she gave conflicting accounts of the events that led to the killing. After further investigation, she was charged with second degree murder.

ERRORS PATENT
In accordance with Louisiana Code Criminal Procedure Article 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we found no errors patent.

ASSIGNMENT OF ERROR NO. 1
The Defendant contends that the State failed to offer sufficient evidence to prove that the Defendant did not kill the victim in self defense, or alternatively, that the Defendant did not act in the heat of passion, thereby warranting conviction for only manslaughter. We find that the State proved the Defendant was guilty of second degree murder, therefore, the Defendant's contentions have no merit.
*1123 This court has previously explained the structure of sufficiency reviews:
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino[ v. King], 436 So.2d 559 [La.1983], (citing State v. Richardson, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.
State v. Kennerson, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.
The Defendant was charged with the offense of second degree murder, which is defined as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. See La.R.S. 14:30.1. "When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Hall, 606 So.2d 972, 973 (La.App. 3 Cir. 1992), writ denied, 93-51 (La. 11/11/94), 644 So.2d 385 (citing State v. Garcia, 483 So.2d 953 (La.1986)).
As contained in La.R.S. 14:20(1):
A homicide is justifiable:
When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
In brief to this court, the Defendant stipulates that she killed the victim and confessed to the act during her statement to authorities. However, she alleges that she stabbed Mr. Roy in self-defense, as she was attempting to leave his apartment with her children. During the Defendant's trial, numerous witnesses testified for and against the Defendant, and most described a stormy, sometimes violent relationship between the Defendant and the victim. Ms. Nichole Sinegal, who was romantically involved with the victim and was mentioned by several witnesses during the Defendant's trial, was summoned to testify but could not be located.
The State first called Mr. James Randall, Jr., a lifelong friend and nephew of the victim. Mr. Randall testified that he worked with the victim six days per week, installing floors, and that he knew the Defendant for about two years. He further testified that he went to the victim's apartment a few days prior to the murder and found the victim and the Defendant in an argument. Mr. Randall indicated that the victim wanted the Defendant and her children out of the apartment and would not leave for work until they were gone. He further testified that he was aware that the victim and Defendant *1124 had split up on past occasions. Mr. Randall had never seen bruises on the Defendant during the time that he knew the couple.
Mr. Damien Roy, another nephew of the victim, testified that he was present at a family gathering in Carencro, on an unspecified date, where the victim and Defendant were in attendance. He testified that the Defendant became extremely angry when the victim left the gathering for a time. While the victim was away, the Defendant threatened to kill him if she found that he was seeing another woman. The threat was made within the hearing of a number of attendees. Upon the victim's return to the gathering, the Defendant calmed down.
Mr. Ronald Roy, Sr., the victim's brother, testified that the Defendant was very possessive of the victim and frequently called to check on his whereabouts. Mr. Roy lived next to the victim at one time and stated that the victim attempted to end the relationship with the Defendant several times. He recalled an occasion, about five months before the murder, when the victim evicted the Defendant from the apartment, only to find that, upon his arrival from a weekend away, she had returned and reoccupied the apartment. The victim was accompanied by another girlfriend, Ms. Nichole Sinegal. Mr. Roy testified that the victim told him that he intended to reestablish his prior relationship with Ms. Sinegal and was attempting to break up with the Defendant. After the victim and Ms. Sinegal entered the apartment, an argument ensued, whereupon the Defendant physically attacked the victim. Mr. Roy attempted unsuccessfully to halt the Defendant's assault on the victim, and the Defendant then attacked Ms. Sinegal. Mr. Roy physically removed Ms. Sinegal from the scene, and the victim eventually escaped to his automobile. As the victim and Ms. Sinegal attempted to drive away, the Defendant threw a barbeque pit at the car, hitting the roof of the vehicle. The Carencro Police arrived some time later, and arrested the Defendant for battery of the victim. Mr. Roy further testified that the Defendant never appeared afraid of the victim and that she previously told Mr. Roy that she would kill the victim if he attempted to leave her for another woman. He also recalled another incident where the Defendant and victim began to argue while at Mr. Roy's house. Once again, the Defendant physically attacked the victim and had to be restrained by Mr. Roy.
Ms. Cheryl Lewis, the victim's sister, testified that the Defendant told her that she was in love with the victim, even during his prior relationship with Ms. Sinegal. The Defendant was obsessed with the victim and was always concerned with the whereabouts of the victim when out of her presence. She was aware that the victim and Defendant broke up several times and that the victim was reestablishing a relationship with Ms. Sinegal at the time of the murder. Ms. Lewis was present during another occasion at the victim's apartment, when the Defendant and victim began to argue, whereupon the Defendant struck and pushed the victim. Ms. Lewis and her sister, who was present at the time, attempted to separate the couple, only to have the Defendant reinitiate the conflict several times. Ms. Lewis had to persuade the victim to leave the area to avoid further attacks by the Defendant. Ms. Lewis was also present at the family gathering during which the Defendant threatened to kill the victim. She indicated that the gathering was held about three weeks prior to the fight where the Defendant threw the barbeque pit at the victim's *1125 car. She stated that the Defendant became frantic when the victim left the party and told Ms. Lewis that she believed the victim was leaving in order to meet another woman and that she would kill him if she ever caught him with someone else. Ms. Lewis testified that the victim was with Ms. Sinegal earlier on the night of his murder.
Ms. Lisa Roy, also a sister of the victim, testified that she knew that Ms. Sinegal and the victim broke up prior to his relationship with the Defendant and that the victim and Defendant often argued. She was present at the altercation at the victim's apartment, described by Ms. Lewis, and confirmed that the Defendant initiated the physical confrontation by striking the victim. Ms. Roy also stated that the Defendant refused to end her attacks on the victim, returning to strike and scratch him after the two were separated. She also attended the family gathering, and stated that the Defendant was "out of control" during the time that the victim was gone and that she clearly heard the Defendant threaten to kill the victim if she found him with someone else.
A number of witnesses also testified for the Defendant. Mr. Peter Joseph, a neighbor of the victim's father, testified that he was acquainted with the Defendant and victim during the time that they lived next door to Mr. Roy. He stated that he observed the victim and Defendant in a physical altercation in the yard of their dwelling. Mr. Joseph testified that the victim chased the Defendant, eventually dragging her and hitting her, and that he called the police. The victim forced the Defendant into a van and left the scene prior to the arrival of the police. He stated that he did not see how the altercation began.
Ms. Lynn Joseph, wife of Mr. Peter Joseph, testified that she also witnessed portions of the confrontation between the victim and Defendant. She observed the victim holding the Defendant by the hair and hitting her but also testified that she did not know how the fight started.
Ms. Mary Papillion, a licensed practical nurse who worked with the Defendant at a nursing home, testified that she observed and treated a severe bite mark on the Defendant's shoulder on one occasion while at work. She did not testify regarding anything the Defendant might have said regarding the cause of the wound. Ms. Papillion also stated that the Defendant reported to work on several occasions with scratches and bruises, but that she did not inquire further.
Mr. Steven Barlow, an employee of the nursing home where the Defendant worked, testified that he observed the Defendant with swollen eyes, abrasions, and a limp on one occasion. He did not testify concerning any knowledge of the source of the injuries.
Ms. Mary Savoy, a neighbor and babysitter for the Defendant during part of the time that she lived with the victim, testified that she observed the Defendant with a black eye on two or three occasions. She stated that she called the police to the Defendant's residence once, after the Defendant sent her children to Ms. Savoy's house during an apparent argument.
Ms. Joyce Davis, the Defendant's mother, testified that she had regular contact with the Defendant during the time she was living with the victim. She stated that she observed injuries to the Defendant "many times" and that, on one visit to the Defendant's residence, while the victim was not home, she saw that her face was *1126 swollen. Ms. Davis called the police, but the victim was not located. On another occasion, while driving with her husband, she witnessed the Defendant hanging out of the open window of the victim's moving car. She further testified that the Defendant and victim broke up several times during the course of their relationship.
Brandy Paddio, the Defendant's sister, testified that she saw her sister at the hospital in a wheelchair, with multiple bruises to her face and body. She further stated that she took the Defendant to the hospital for other injuries on several occasions. After these trips to the hospital, the Defendant stayed at her mother's house for a few days before eventually returning to live with the victim. Ms. Paddio did not personally witness any violent incidents between the victim and Defendant.
Mr. Paul Mercier, the Defendant's stepfather, testified that he also observed the incident during which the Defendant was hanging out of the victim's moving automobile. The victim's vehicle was weaving in the roadway and came to a stop some distance away from the point that the two vehicles passed each other. When Mr. Mercier approached the victim's car, the Defendant was not inside and the victim was standing beside the vehicle. Mr. Mercier left the scene and was flagged down by another vehicle, which had picked the Defendant up farther down the road. The Defendant got in Mr. Mercier's car. As he drove the Defendant home, the victim's vehicle approached from the rear and the victim honked repeatedly in an attempt to get Mr. Mercier to stop. After Mr. Mercier halted his car, the victim approached, yelling obscenities at the Defendant. Mr. Mercier was also aware that the Defendant broke up and reunited with the victim on several occasions.
In addition to the testimony of relatives and acquaintances of the victim and Defendant, the State presented testimony from police officers who interviewed the Defendant and examined the crime scene and from a forensic pathologist who examined the victim. The defense countered with an expert witness of its own.
Detective Dwayne Prejean, of the Lafayette Police Department, was offered by the State and accepted as an expert in the area of blood splatter analysis. Detective Prejean testified that he was dispatched to the crime scene on the day the victim was killed. He photographed the scene and collected evidence, and testified at trial concerning the pattern of blood spatters in the victim's apartment, as well as the blood on the Defendant. He described the eleven-and-one-half inch kitchen knife that was used by the Defendant to stab the victim. The detective could not give an opinion regarding the sequence of events which resulted in the death of the victim, and stated only that he believed the victim was stabbed in the area of the bed and fell on the bed after being stabbed, ultimately rolling onto the floor.
Dr. Emile Laga performed the autopsy on the victim and was offered and accepted by the State as an expert in the fields of forensic pathology, chemistry, and toxicology. He testified that the victim died from a single, oblique, downward stab wound between the ribs of the left side, about six-and-one-half inches deep, which severed the victim's aorta and resulted in death within five minutes or less. There were no defensive wounds on the victim's hand or arms. Dr. Laga also reported that the victim had a blood alcohol level of ".11" and an unspecified amount of cocaine was present as well. The cocaine could have been ingested by the victim up to *1127 three days prior to death. He also examined a photograph of the Defendant's face, taken on the night of the murder, and testified that there was discoloration, but no swelling, under the right eye. He testified that the redness could have been caused by an allergy or some other cause.
Detective Sonny Stutes, of the Lafayette Parish Sheriff's Office, testified that he was called to the murder scene on the night of the killing. When he arrived, he found the Defendant covered in blood and saying in a loud voice that "she didn't mean to do it." He found the victim on the floor, lying dead in a pool of blood. Upon investigation, he determined that the Defendant's children went upstairs to a neighbor's apartment and did not witness the murder. The children asked the neighbor to call "911," but did not provide any information to investigators or testify during the Defendant's trial. There were no witnesses to the events leading up to the killing other than the Defendant. The Defendant was transported to the Lafayette Parish Sheriff's Office, where she waived her rights and gave a videotaped statement to the police. The tape was played for the jury during the Defendant's trial.
The Defendant initially stated that she was in an argument with the victim, was hit by him, went into the kitchen to retrieve a knife, went back into the bedroom, and stabbed the victim when he attempted to strike her. She did not state that she specifically retrieved the knife for the purpose of self-defense. However, the Defendant then stated that she argued with the victim. He struck her once and pulled her hair to prevent her from going to get the knife. She escaped, obtained the knife, returned, and stabbed the victim as he attempted to strike her again. She offered a third version of the story, wherein the two were arguing in the bedroom and she was struck by the victim; she walked into the living room and began packing her children's clothes to leave the apartment. The victim was cursing and threatening her from the bedroom, whereupon she decided "she wasn't going to take it any more" and retrieved the knife, entered the bedroom, and stabbed the victim as he attempted to strike her again.
The detective also testified that he found two book bags by the apartment door, which were closed and zipped up. He stated that the apartment was fairly neat, that nothing was knocked over, as would be expected in a physical disturbance, that no objects in the apartment seemed disturbed, and that the Defendant's hair was "slightly disturbed" in the back but her clothes were not torn. She did not have any markings on her that appeared to be from a recent physical altercation.
The Defense offered Dr. Donald Harper as an expert in psychopharmacology and was accepted as such by the court. Dr. Harper testified concerning the level of cocaine found in the victim's system and stated that it appeared the victim probably took "large amounts over a long period of time." He stated that, in general, a combination of alcohol and cocaine, as present in the victim's system, would make a person more aggressive. He further testified that it was possible, though not certain, that the victim ingested the cocaine within ten hours of the time of death and that the cocaine was still in the victim's system at some unquantifiable level when he was killed.
Contrary to the opinion of Dr. Harper, Dr. Laga testified on rebuttal that the cocaine found in the victim's system could *1128 have been ingested at any time within three days of his death, and that it is impossible to determine the precise point with any greater accuracy. He further testified that he found no physical symptoms of chronic cocaine use by the victim during his examination. Dr. Laga also stated that it was impossible to tell whether the victim suffered any impairment at the time of death because of the cocaine found in his system, due to the fact that an exact time of ingestion could not be determined.
In brief to this court, the Defendant points to the various instances where the victim was observed striking the Defendant, to the cocaine use by the victim, and to the Defendant's allegation that she was trying to leave the apartment on the night of the murder and responded only when attacked by the victim. However, the jury evaluated each of these contentions and found that the Defendant did not act in self-defense.
As previously noted, the murder scene did not show any signs of a violent physical confrontation. There was no evidence that the victim was armed. The Defendant did not have any apparent signs of recent injury, nor did she have torn clothes or other signs of a struggle.
Testimony revealed that the Defendant physically attacked the victim on several prior occasions and continued the assaults even when separated by intervening third parties. She made frequent threats to kill the victim on previous occasions and was extremely jealous and possessive. The Defendant encountered the victim with Ms. Sinegal, his previous girlfriend, on at least one occasion prior to the murder, and there was testimony that the victim intended to break off his relationship with the Defendant in favor of resuming a relationship with Ms. Sinegal.
The Defendant gave conflicting stories to the police regarding events surrounding the murder, all of which include the fact that she broke away or left the confrontation in the bedroom, went to the kitchen to retrieve the murder weapon, and returned to the bedroom, where she killed the victim. Under any of the scenarios offered by the Defendant, it was unnecessary to kill the victim. Once out of the bedroom, she could simply have left the apartment. There was no evidence that the victim pursued the Defendant once she left the bedroom; therefore, there was no imminent danger that the Defendant was going to be killed or receive great bodily harm. Accordingly, we find that the State submitted sufficient evidence to prove, beyond a reasonable doubt, that the victim did not act in self-defense. This contention, therefore, has no merit.
Alternatively, the Defendant contends that she killed the victim in the heat of passion and that the jury should have convicted her of manslaughter. Manslaughter is defined in La.R.S. 14:31(A)(1) as:
Manslaughter is:
A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
Manslaughter exists if a defendant can prove by a preponderance of the evidence *1129 that mitigating factors, such as provocation, exist. State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076, cert. denied, 525 U.S. 831, 119 S.Ct. 84, 142 L.Ed.2d 66 (1998).
In brief, the Defendant points out that she and the victim were arguing on the night of the murder and the victim's body contained both alcohol and cocaine, which could have made the victim more aggressive. None of the facts elicited at trial demonstrate that Defendant was provoked to the point where she acted in "sudden passion or heat of blood." Indeed, there was no testimony regarding the events immediately preceding the murder. We note that the Defendant had been in numerous verbal and physical confrontations with the victim on previous occasions, some of which she initiated. On many such occasions, she simply left the scene, often staying with friends or relatives. In each instance she chose to return to live with the victim.
However, on the night of the murder, she decided to arm herself, reenter the bedroom and stab the victim. Absent signs of a physical confrontation on the evening of the murder, considering the Defendant's previous threats to kill the victim, and in light of the fact that the jury heard all of the evidence regarding the turbulent nature of the relationship, we find that the Defendant failed to prove that the jury erred in finding insufficient evidence to support her claim that she acted in the heat of passion. This contention therefore lacks merit.

ASSIGNMENT OF ERROR NO. 2
The Defendant contends that the trial court erred in denying her motion in arrest of judgment. We conclude that the trial court correctly denied the motion and that the Defendant's contention to this court has no merit.
Following her trial, the Defendant filed her motion based on the claim that the trial violated the prohibition against double jeopardy. The Defendant was previously brought to trial on the same charge, but a mistrial was declared when the prosecutor called the Defendant as his first witness. The Defendant contends that the trial court erred in finding that the action of the prosecutor was not intentional and that the Defendant suffered no prejudice by the retrial.
In Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the court held that a mistrial does not normally bar a second prosecution unless the conduct of the prosecutor, which caused the mistrial, was intended to provoke the defendant into moving for a mistrial. See also State v. Brossette, 93-1036 (La.App. 3 Cir. 3/2/94), 634 So.2d 1309, writ denied, 94-802 (La.6/24/94), 640 So.2d 1344. The prosecutor's conduct must be overreaching and considered bad faith harassment which seriously prejudices the defendant causing him to "reasonably conclude that a continuation of the tainted proceeding would result in a conviction." United States v. Dinitz, 424 U.S. 600, 608, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976).
In the Defendant's case, the prosecutor stated, during the hearing on the motion in arrest of judgment, that he was inexperienced in criminal trials and routinely called defendants to testify during his civil trial practice. He also questioned defense counsel, Mr. Chris Larue, who stated that the prosecutor told him that he intended to call the Defendant to testify and that he relayed the information to co-counsel, Mr. Paul Marx. Neither Mr. *1130 Larue nor Mr. Marx believed that the prosecutor would actually call the Defendant, and they believed that he was joking. The prosecutor also reminded the court that, when the Defendant's mistrial was ordered during the first trial, he apologized to everyone in court for the error, offered to be publicly reprimanded by the court in lieu of a mistrial, and vigorously argued that the trial should continue. The trial judge in the Defendant's current trial accepted the representation of the prosecutor that his actions in the first trial were unintentional and not intended to provoke a mistrial in the Defendant's case. The court also noted that the evidence of the "bad character" of the Defendant, which was permitted during the second trial, consisted of prior threats by the Defendant against the victim, and were properly admitted to prove motive, intent, or plan, and that the judge in the first trial was not presented with a request to admit such evidence.
Further, the court found that the Defendant suffered no prejudice as a result of the mistrial. Mr. Larue testified that the Defendant's case was better prepared during the second trial than during the first. The court noted that the defense was able to obtain the toxicology report on the victim and had hired Dr. Harper as an expert for the defense in the interim between trials.
Mere negligence by a prosecutor is not sufficient to bar a second prosecution on the same charges. State v. Amato, 96-606 (La.App. 1 Cir. 6/30/97), 698 So.2d 972, writs denied, 97-2626, 97-2644 (La.2/20/98), 709 So.2d 772. Further, when such conduct does not indicate bad faith on the part of the prosecutor, retrial is permissible. State v. Cannon, 383 So.2d 389 (La.1980), cert. denied, 454 U.S. 1052, 102 S.Ct. 596, 70 L.Ed.2d 587 (1981).
Considering the forgoing, the trial court did not err in concluding that the prosecution of the Defendant, following a mistrial in the case, was not a violation of the prohibition against double jeopardy. The error by the prosecutor during the first trial was unintentional, was not done in bad faith, and was not intended to provoke a mistrial. The defense was actually better prepared during the second trial, and the Defendant suffered no prejudice as a result of the retrial. Accordingly, this contention by the Defendant has no merit.

ASSIGNMENT OF ERROR NO. 3
The Defendant contends that the mandatory life sentence imposed on her was constitutionally excessive. This contention has no merit.
After the Defendant was convicted of second degree murder, the trial court imposed the mandatory sentence of life imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence as required by La.R.S. 14:30.1(B). Defense counsel orally objected and informed the court that he would file a motion to reconsider sentence, seeking a "Dorthey exception" to the mandatory sentence. The written motion to reconsider sentence was filed on December 17, 2001, and was denied with written reasons issued on February 25, 2002.
In her motion, the Defendant cited the history of domestic violence between her and the victim, stated that the sentence did not contribute to the goal of punishment, and stated that the legislature erred in failing to "assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." In denying the motion, the trial court ruled that the jury did not accept the Defendant's *1131 arguments that she was abused and was not the aggressor, or that her actions constituted self-defense. The trial court further found that it had no alternative to sentence the Defendant to any sentence, other than the mandatory life sentence required by statute. On appeal, the Defendant also contends that the record does not contain facts which could have been used to determine aggravating and mitigating factors, as required by Louisiana Code of Criminal Procedure Article 894.1, and that the Defendant is not "the most blameworthy and egregious offender."
Regarding the Defendant's claim that her sentence is excessive, we note that a sentence, although within the statutory limit, is considered to be excessive if "the penalty is grossly out of proportion to the severity of the crime or if it is nothing more than the purposeless and needless imposition of pain and suffering." State v. Kitchen, 94-900, p. 3 (La.App. 3 Cir. 2/1/95), 649 So.2d 1227, 1229, writ denied, 95-537 (La.6/23/95), 656 So.2d 1012 (quoting State v. Bonanno, 384 So.2d 355, 357 (La.1980)). A mandatory life sentence is not per se unconstitutional. Richardson v. La. Dept. of Public Safety and Corrections, 627 So.2d 635 (La.1993). However, a trial court has the authority to determine whether a mandatory minimum sentence is constitutionally excessive as applied to a particular defendant. State v. Dorthey, 623 So.2d 1276 (La.1993). Further, this review extends to all mandatory minimum sentences and not just those imposed under the habitual offender law. State v. Fobbs, 99-1024 (La.9/24/99), 744 So.2d 1274.
Nevertheless, a court may depart from a minimum sentence only if it finds that there is clear and convincing evidence that rebuts the presumption of constitutionality. State v. Lindsey, 99-3256, 99-3302 (La.10/17/00), 770 So.2d 339, cert. denied, 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001). To rebut the presumption, a defendant must show, by clear and convincing evidence, that, "because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." State v. Johnson, 97-1906, p. 8 (La.3/4/98), 709 So.2d 672, 676 (quoting from Judge Plotkin's concurrence in State v. Young, 94-1636, pp. 5-6 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 531, writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223).
Although it appears the trial court erred in stating it had no alternative but to impose the mandatory life sentence, we can review the sentence for excessiveness. See State v. Derouin, 00-1150 (La.App. 3 Cir. 1/31/01), 778 So.2d 1186. In the Defendant's case, the record contains no evidence the trial court could have reviewed to determine that the mandatory life sentence was constitutionally excessive. In brief, she reiterates her claim that she acted in self-defense and that she was abused by the victim. There was no presentence investigation report, and the Defendant provided no information to the court, or in brief on appeal, which would support such a departure. As noted by the trial court, these claims were rejected by the jury in the Defendant's case and therefore, do not provide a basis for deviation from the mandatory sentence.
Further, regarding Defendant's claim that the trial court failed to state aggravating and mitigating factors, compliance *1132 with Article 894.1 is met in such cases when the court informs the defendant that he or she is receiving the sentence mandated by law. State v. Burns, 97-1553 (La.App. 4 Cir. 11/10/98), 723 So.2d 1013, writ denied, 98-3054 (La.4/1/99), 741 So.2d 1282. This contention, therefore, has no merit.
Accordingly, the trial court did not err in denying Defendant's motion to reconsider sentence, and the sentence imposed upon the Defendant is not constitutionally excessive.

CONCLUSION
The Defendant's conviction and sentence are affirmed.
AFFIRMED.