# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-484

**STATE OF LOUISIANA**

**VERSUS**

**DEREGINALD L. KING**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 80,079
HONORABLE CRAIG O. MARCOTTE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**CHARLES G. FITZGERALD
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sharon Darville Wilson, Charles G. Fitzgerald, and Ledricka Johnson Thierry, Judges.

**CONVICTION AND SENTENCE AFFIRMED.**

**Harry L. Daniels, III**
**Daniels & Washington**
**38167 Post Office Road**
**Prairieville, Louisiana 70769**
**(225) 346-6280**
**Counsel for Defendant/Appellant:**
**Dereginald L. King**

**George Winston, III**
**The Winston Law Firm, LLC**
**400 Travis Street, Suite 901**
**Shreveport, Louisiana 71101**
**(318) 575-9596**
**Counsel for Defendant/Appellant:**
**Dereginald L. King**

**Don M. Burkett**
**District Attorney**
**Suzanne M. Ellis**
**Assistant District Attorney**
**Eleventh Judicial District**
**Post Office Box 1557**
**Many, Louisiana 71449**
**(318) 256-6426**
**Counsel for Appellee:**
**State of Louisiana**

**FITZGERALD, Judge.**

Defendant, Dereginald L. King, appeals his conviction and sentence for second degree murder.

## PROCEDURAL HISTORY

On December 31, 2019, Defendant and his accomplice, Aaron Jawaun Holmes, entered the victim's vehicle to buy marijuana. Defendant, armed with a gun, shot the victim, took a gun he claimed belonged to the victim, and left the scene. The victim was subsequently found dead in the vehicle. When initially questioned by police, Defendant denied any involvement in the shooting. Defendant eventually admitted to shooting the victim but claimed it was done in self-defense.

In February 2020, Defendant and Aaron were each charged with one count of first degree murder in violation of La.R.S. 14:30(A)(6). The trial of these co-defendants was ultimately severed. And in March 2023, a two-day jury trial against Defendant was held.

At the conclusion of trial, the jury unanimously convicted Defendant of the responsive verdict of second degree murder in violation of La.R.S. 14:30.1(A). Defendant moved for a new trial, but this motion was denied. The trial court then sentenced Defendant to life in prison at hard labor without benefit of probation, parole, or suspension of sentence. Defendant appealed.

On appeal, Defendant asserts three assignments of error:

1. The evidence adduced at trial was insufficient to convict [Defendant] of the murder of Joshua Graves.

2. The erroneous admission of evidence of other crimes deprived [Defendant] of his right to a fair trial.

3. The trial court erred when it denied [Defendant] the right to a fair and impartial jury.

**LAW AND ANALYSIS**

All appeals are initially reviewed for errors patent on the face of the record. La.Code Crim.P. art. 920. After reviewing the record, we find no errors patent.

## I. First Assignment of Error

In his first assignment of error, Defendant challenges the sufficiency of the evidence to convict him of second degree murder. Defendant specifically argues that the State failed to prove he had the specific intent to kill the victim. He further argues that the State failed to disprove his defense of justifiable homicide.

A sufficiency-of-the-evidence challenge is reviewed on appeal under the standard set forth by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. "This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521. The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

A reviewing court must afford great deference to a jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writ denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, *and writ denied*, 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id*. at 626.

2

### A. Summary of the Record Evidence

At the beginning of trial, the parties stipulated that a spent cartridge found on the front passenger floorboard of the victim's car was fired from the weapon Defendant was carrying when he entered the car.

The State's first witness was Dontavius Turner. Dontavius testified that he attended a New Year's Eve party with Defendant on the night of the shooting. According to Dontavius, he, Defendant, and three others—Aaron, Carnelius Holmes, and Jacorius Turner—left the party to buy marijuana. Aaron had called the victim, Joshua Graves, to buy the marijuana. Dontavius explained that when the victim arrived, Defendant and Aaron entered the victim's car. Aaron sat in the front passenger seat next to the victim, and Defendant sat in the back seat directly behind the victim. When asked how long Defendant and Aaron were in the victim's car, Dontavius replied:

> Well, it wadn't [sic] long, like, we sit in the car, watching the girls pop firecrackers and listening to music. Like, 20, 30 minutes later he walked up there. That when he say [the victim] had pulled a gun on him, so he had to shoot him. It wadn't [sic] that long, though.

Dontavius then clarified that the Defendant was the one who walked up to the car Dontavius was sitting in. Dontavius described Defendant as looking like himself, but he was carrying two guns. The first gun, which was silver, was tucked into Defendant's waistband behind his shirt. And the second gun, which was black, was in Defendant's hand. Aaron, on the other hand, remained in the victim's car for another ten minutes. And when he exited the vehicle, he was walking slowly like he was in a daze. Dontavius also noted that after the shooting, Defendant asked Carnelius for a ride, but Carnelius refused. Defendant then ran off.

The next witness was Chief Ray Williams, of the Pleasant Hill Police Department. Chief Williams explained that he was notified of the shooting between

10:00 and 10:30 on the night in question. He drove to the scene and recognized the victim's car upon his arrival. He observed that the victim had been shot in the head and that the "glove compartment was opened." He further observed that the center console had also been left open.

On cross-examination, Chief Williams acknowledged that Aaron contacted his office shortly after the incident, that Aaron provided a formal statement about what had happened, and that Aaron provided the police with Defendant's name.

The State's next witness was Detective David Wade Seegers, of the Sabine Parish Sheriff's Department. Detective Seegers was the lead investigator. When he arrived at the scene, he immediately observed that the victim had been shot and "was sitting in the driver's seat, kind of leaned over to the door[.]" The detective also observed that the center console was open. On this point, he expounded:

A.   The biggest thing was that this console lid had blood on top of it.

Q.   Okay.

A.   And it was running down the sides, which my first conclusion was this – this console was closed when this – when this happened, when Graves was shot.

Q.   And why did you think that?

A.   Because there's no other way that blood's going to be on top of that console. There's no way that that could have been opened before and that blood would have been on top of it like that. It's not going to come in from the side.

Detective Seegers also found a spent shell casing on the front passenger floorboard and a white grocery bag containing marijuana between the driver's seat and the center console. When asked if any other shell casings were found in the vehicle or its vicinity, the detective answered, "We didn't locate any." In fact, the evidence showed that only one shot was fired inside the vehicle. As to the bag of marijuana, Detective Seegers testified that it contained about eighty-one grams of

4

marijuana or "a big handful" or "a small double handful." The detective stated that this amount was consistent with selling rather than for personal use.

Next, Detective Seegers testified that he interviewed Defendant on two consecutive days. According to Detective Seegers, Defendant initially denied being at the scene and denied knowledge of the shooting, but Defendant eventually admitted to being at the scene and to pulling the trigger.

Detective Seegers was then questioned about the results in a report from the North Louisiana Criminalistics Laboratory. In relevant part, the detective explained that the bullet removed during the victim's autopsy was determined to have been fired from Defendant's gun. As to the victim's firearm, the detective confirmed that no shots had been fired from that gun and that Defendant admitted taking it when he exited the victim's vehicle.

Detective Seegers was then questioned about photographs and other information that had been retrieved from the victim's cellphone. For instance, one of the photographs was a selfie of the victim dated December 31, 2019, at 5:11 p.m. This photograph, according to Detective Seegers, shows the victim "fanning out some cash[]" and holding "some hundreds and some ones." There was also a photograph taken two minutes earlier which shows the victim "holding all of that cash in his hand," which looked like "a bunch of twenties, about four one hundreds[.]" These photographs were taken approximately five hours before the victim was killed.

The State's next witness was Dr. James Traylor Jr., who was accepted as an expert in forensic pathology. Dr. Traylor performed the victim's autopsy. According to Dr. Traylor, he found evidence of a gunshot that traversed the victim's forearm and an entry wound to the victim's head between his ear and eye. Dr. Traylor opined that one gunshot entered the victim's dorsal right forearm, exited the

5

dorsal right forearm, and entered the victim's face. Dr. Traylor explained that a bullet travels in a straight line, meaning that the victim's arm would have been raised "for it to come through the forearm, strike the face, and then end up over in the posterior left neck." Dr. Traylor acknowledged that the evidence showing the victim's arm was raised when he was shot "could be construed as a defensive position[,]" but it did not necessarily have to be construed that way. Dr. Traylor then addressed the victim's toxicology results, which showed a low level of marijuana (tetrahydrocannabinol), along with nicotine and caffeine.

The State's final witness was Sara Davis. She was called to give "other crimes" evidence against Defendant. Sara acknowledged that she had issues with drugs and that she had recently paroled out of a ten-year sentence for distribution of methamphetamine. When asked if she initiated contact with the police about testifying, Sara replied, "No. Y'all came and got me." According to Sara, the State already had information about an incident involving her and Defendant that occurred six months before the murder at issue.

Recalling this earlier incident, Sara testified that she received a phone call from Leroy Holmes around 2:00 or 3:00 in the morning. Leroy wanted an "8-ball," which is 3.5 grams of methamphetamine. So Sara drove to meet Leroy and Defendant, both of whom got into her car. According to Sara, Leroy sat in the front passenger seat, and Defendant sat in the back seat directly behind her. She then drove them to Defendant's house so Defendant could retrieve some money. When they arrived, Defendant exited the vehicle. But upon his return, Defendant stood next to the vehicle and placed a gun to Sara's neck—through her window which was halfway down—and said, "I want you to give me everything you got right now, white girl." Sara attempted to speed off, but Defendant "busted" her head with his gun before she could flee. Although stunned, Sara was able to escape. She then

dropped Leroy off at his house and then went to her friend's house to get treatment for her head injury.

Sara explained that she did not go to the hospital because she had been injured during a drug deal. Likewise, she explained that she did not report the matter to the police because she had been selling drugs. The State rested its case following Sara's testimony.

Turning now to the defense-in-chief. The only witness called by defense counsel was Defendant. Defendant testified that while at the New Year's Eve party on the night in question, he and a few others decided to get something to "smoke." According to Defendant, Dontavius called the victim to buy drugs. Defendant acknowledged that he and Aaron got into the victim's car when the victim arrived: Aaron got into the front seat because he knew the victim better than Defendant, and Defendant got into the back seat. Defendant also acknowledged that he was carrying a handgun when he entered the car. When asked what happened next, Defendant testified as follows:

> A.  Um, so when I get in the car, um, I don't know where we went wrong at, but he just started swinging his gun and saying something. But, I mean, I can't really remember everything he was saying, but he was saying something. And, you know what I'm saying, I got scared. I mean, like, I ain't never had anybody pull a gun on me. I ain't never pulled a gun on nobody else, but – let alone somebody pointing a gun at me in my face and [Aaron's] face. And I didn't know what else to do, so I pulled my gun. But by the time I pulled my gun up, he had cocked his. And once he turned around. I shot.
>
> Q.  Okay. You're telling us you did shoot him.
>
> A.  Yes, sir.
>
> Q.  Okay. And the reason why is –
>
> A.  Because I was –
>
> Q.  [H]e pointed his gun at you and cocked it?

A.    Yes, sir. I was scared and I ain't had no – I mean, he left me no choice. I hated it, but he left me no choice.

Defendant testified that his only intent that night was to purchase marijuana. When asked what happened immediately after he shot the victim, Defendant explained:

A.    When – when – when I shot – and that goes to how I got his gun – when I shot, when he swung his arm and I shot, his gun come out of his hand and slapped me on my – you know what I'm saying – and slapped me here (Indicating). So when I jumped out of the car, I just took off running and still had it, too.

Q.    Why – why did you – was it a conscious decision to take his gun?

A.    No. It just – once it landed, I was already in motion in leaving. I was scared.

According to Defendant, he then made his way to Carnelius's parked car. And when he saw Carnelius, Defendant said, "I told him, know what I'm saying, 'In the midst of us getting the smoke,' you know what I'm saying, 'he pulled a gun on me. It scared us, so I shot him.'" Defendant acknowledged that Carnelius declined his request for a ride, so Defendant "ran through the trail."

When Defendant was asked why he initially denied the incident to police, he responded:

It was because I was scared, and I didn't want no part of that. I ain't never did no harm to nobody like that, you know what I'm saying, let alone somebody doing something to me. I mean, in my mind, I was really protecting myself but at the same time, somebody died. So, you know what I'm saying, that ain't never happened around me before.

Later, Defendant testified that he did not see any money in the victim's car and that he was only in the car for two to four minutes. As for Sara Davis, Defendant testified that he knew her and had used drugs with her but had never bought drugs from her. When asked if he knew what Sara was talking about when she said he stuck a gun to her neck, Defendant testified, "No, sir. I ain't never pointed a gun at

no one until that night." Defendant clarified that by "that night" he meant the night he was on trial for.

During cross-examination, the State asked Defendant why he was carrying a gun with him on the day at issue. Defendant responded, "Because I shoot – we shoot guns, and from where I'm from, for New Year's." According to Defendant, the gun was in the waistband of his jeans. Defendant then testified as follows about what he did with the gun once inside the victim's vehicle:

> Q. Now you testified in your statement that when you got in the back seat of the car you were uncomfortable because you're kind of big, and you was leaning over. So you pulled it out to put it in your lap, is that correct? That's what you told on the statement.
>
> A. That's what I said.
>
> Q. And so, did you just lay it on top of your legs or lay it beside you on the seat or were you holding it in your hand? Tell me how you were holding – what was the gun doing?
>
> A. I wasn't holding it. I mean, it was just – I moved it from my – from my middle to my side.
>
> Q. To your side. You laid it on the seat beside you?
>
> A. No, sir.
>
> Q. Well, what did you do with it?
>
> A. I didn't pull it out. I didn't actually pull it out. I moved it over.
>
> Q. Well, now, when you gave your statement – we can back it up and find it on there where it is, but you said you pulled it out and put it in your lap.
>
> A. Well, I moved it to the side.
>
> Q. So you were in error when you told them on the tape that you moved it to your lap, is that correct? That's not correct now. You remember telling that at the time, though, huh?
>
> A. I know what I said.
>
> Q. You said you put it in your lap, right?
>
> A. I moved it to the side.

9

Q. Well, what did you say when you gave your statement back the day after this happened?

A. It was already in my lap if it was tucked in the front.

Q. All right.

A. So when I sat down, I had to move it to the side.

Q. So you took your gun out.

A. (No response)

Q. When you got in the car, you told us before on your taped statement you took the gun out and put it in your lap.

A. Yes, sir.

When the State asked Defendant why Aaron, who knew the victim, did not go buy the marijuana by himself, Defendant responded, "Because I was supposed to been getting introduced because I had just moved to Pleasant Hill." Defendant explained that he had been in Baton Rouge about eight years, staying with his wife. But when asked if he had just come back from Baton Rouge not long before the shooting, Defendant answered, "No. I'd probably been back about a year and a half."

Defendant was then asked about his earlier testimony: that the victim cocked his gun. Defendant clarified that "cocking" meant "jacking one into the chamber." Defendant reiterated that the victim pulled out his gun and waved it around for no reason. According to Defendant, the victim said something and then immediately cocked the gun and put one in the chamber. This is when the victim then started to turn around, at which point Defendant shot the victim. Defendant clarified that he was not trying to shoot the victim in the head or kill him; he was just trying to protect himself. Defendant emphasized that he "aimed at his arm[.]"

Finally, Defendant denied opening the console in the victim's car, denied taking money from the victim, and denied having any intent to rob the victim.

10

*B.  Second Degree Murder—Sufficiency of the Evidence*

Louisiana Revised Statutes 14:30.1 defines "second degree murder" as follows:

> A. Second degree murder is the killing of a human being:
>
> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
>
> (2) When the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery . . . even though he has no intent to kill or to inflict great bodily harm.

"Specific criminal intent" is defined by La.R.S. 14:10(1), which states: "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  As explained in *State v. Draughn*, 05-1825, pp. 7–8 (La. 1/17/07), 950 So.2d 583, 592-93, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007), "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant."

Finally, La.R.S. 14:20 addresses the defense of justifiable homicide, stating:

> A. A homicide is justifiable:
>
> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
>
> (2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention.  The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

At trial, the State had the affirmative burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense. *State v. Paddio*, 02-722 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, *writ denied*, 03-402 (La. 2/13/04), 867

11

So.2d 682. This burden of proof was addressed in *State v. Fox*, 15-692 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, *writ denied*, 16-404 (La. 3/13/17), 216 So.3d 800. In that case, this court explained:

> "In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683, pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La.11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La. 2/6/09), 999 So.2d 769.

*Id*. at 890.

Here, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded that Defendant shot the victim with the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1(A)(1). Defendant admitted shooting the victim, albeit in self-defense, and the shooting happened in very close proximity and was to the victim's upper body. Presented with similar facts, this court in *State v. Romero*, 21-173, p. 16 (La.App. 3 Cir. 12/15/21), 331 So.3d 444, 456, expressed the following statement of law:

> "Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill." *State v. Broaden*, 99-2124, p. 18 (La. 2/21/01), 780 So.2d 349, 362, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). Moreover, specific intent can be formed in an instant. *State v. Maxey*, 527 So.2d 551, 555 (La.App. 3 Cir. 1988), *writ denied*, 541 So.2d 868 (La.1989); *State v. Cousan*, 94-2503, p. 13 (La. 11/25/96), 684 So.2d 382, 390.

Additionally, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Defendant killed the victim while engaged in the perpetration or attempted

12

perpetration of an armed robbery. La.R.S. 14:30.1(A)(2). The evidence shows that the victim had cash on him earlier in the evening, that Defendant entered the victim's car armed with a firearm with the intent to purchase drugs from the victim, that the console of the victim's car was opened after the murder, and that no cash was found on or near the victim after the murder. But all that aside, Defendant admitted to shooting the victim and then taking his gun.

Turning now to Defendant's claim of self-defense. Here, too, the State sufficiently disproved Defendant's claim that the homicide was committed in self-defense. Although Defendant claims the victim was waiving a gun and in the process of turning towards him, the jury heard Defendant's testimony and clearly did not believe him.

The jury also listened to Dr. Traylor's testimony about the trajectory of the bullet that killed the victim and heard his conclusion that the victim's arm had to be in a raised position, which could be construed as a defensive position. The jury also heard Sara Davis' testimony that Defendant attempted to rob her at gun point approximately six months before the subject incident. The jury was able to consider Sara's testimony in its evaluation of Defendant's credibility.

In addition, Defendant's actions—fleeing the scene, taking a gun that belonged to the victim, failing to immediately report the shooting, and lying to the police—were not consistent with his claim of self-defense. For example, in *State v. Watson*, 23-18, p. 9 (La.App. 3 Cir. 10/18/23), ___ So.3d ___ (2023 WL 6856630), this court explained:

> Mr. Watson's actions in failing to immediately report the shootings and leaving the scene after shooting the victims are not consistent with his claim that he acted in self-defense. Flight following an offense, as well as concealment, and attempt to avoid apprehension indicate "consciousness of guilt and, therefore, [are] circumstances from which the jury may infer guilt." *State v. Davies*, 350 So.2d 586, 588 (La.1977).

13

Finally, as a trier of fact, a jury is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Dorsey*, 10-216 (La. 9/7/11), 74 So.3d 603. In this case, the jury clearly did not believe Defendant's claim of self-defense. Instead, the jury chose to believe the evidence and testimony that contradicted Defendant's version of events.

In the end, we conclude that a rational trier of fact, when viewing the evidence in the light most favorable to the prosecution, could have found that all hypotheses of innocence were excluded. *See State v. Camp*, 446 So.2d 1207 (La.1984). It was the jury's prerogative to assess the credibility of the witnesses and to accept or reject their testimony. We will not second guess the jury's credibility determinations nor will we impinge on its role as factfinder. Defendant's first assignment of error is thus without merit.

## II.     Second Assignment of Error

In his second assignment, Defendant contends that the trial court's erroneous admission of "other crimes" evidence deprived him of his right to a fair trial. Defendant claims that the evidence of the offense against Sara was not sufficiently proven, did not address a genuine issue of material fact, and was not properly weighed by the trial court.

"Other crimes" evidence is addressed in La.Code Evid. art. 404(B), which states in relevant part:

> **B.  Other crimes, wrongs, or acts; creative or artistic expression.** (1)(a) Except as provided in Article 412 or as otherwise provided by law, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to

14

conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

In addition, the supreme court "maintain[ed] the longstanding requirement of a pre-trial hearing to determine the admissibility of other crimes evidence" in *State v. Taylor*, 16-1124, p. 11 (La. 12/1/16), 217 So.3d 283, 292. At that hearing, "The state is simply required to make some showing of sufficient evidence to support a finding that defendant committed the other act." *Id*. Finally, a trial court's ruling on the admissibility of other crimes evidence will not be disturbed absent an abuse of discretion. *State v. Altenberger*, 13-2518 (La. 4/11/14), 139 So.3d 510.

Here, on November 21, 2022, the State filed a notice of intent to introduce other crimes evidence pursuant to La.Code Evid. art. 404(B). The hearing on the motion was held three weeks later. And at that hearing, the State adduced the testimony of Steven Bradley Marr, an investigator with the Sabine Parish District Attorney's Office.

Mr. Marr testified that on November 18, 2022, he heard about an incident involving Sara and Defendant. Mr. Marr, in turn, brought Sara in for an informal interview that same day. Mr. Marr relayed what he was told by Sara, which was essentially the same testimony Sara gave at trial. Sara's trial testimony is summarized in our discussion of the previous assignment of error.

Nonetheless, Mr. Marr explained that because Sara told him that Leroy Holmes witnessed the prior incident, he brought Leroy in for an interview shortly thereafter. According to Mr. Marr, Leroy corroborated Sara's story:

> A. He corroborated the story. From pretty much from the beginning to the end his story was the same as hers. He seems to remember that – he said, "I think we went into the house of [Defendant] for a few minutes before all of this went down." He thinks they went in and came back to the car. [Sara] didn't remember that. She said she wasn't for sure. He thinks they may have went in, stayed a couple of minutes in the house, and then came back out. And he had never got back in the car. She was in the driver's seat.

15

Q.    And what did he say that [Defendant] did?

A.    Oh, he said he saw [Defendant] strike her with a handgun.

Q.    Did he hear what he said to her before striking her?

A.    Same thing. It was an attempted – an armed robbery. He was – he said, "Give me everything you've got," or "Give me what you got, bitch," some – something along that. The wording wasn't exactly – maybe they wadn't [sic] verbatim, but it was something along those lines.

According to Mr. Marr, Sara did not know what she was being brought in for, but she was very forthcoming about the previous incident. She was also forthcoming about the fact that she was dealing narcotics to support her habit at that time. Mr. Marr clarified that the incident between Sara and Defendant occurred six months before the shooting. And although Sara could not pinpoint the exact month the incident occurred, she said it happened in the summer, possibly July or August, because it was hot. According to Mr. Marr, Sara described the weapon used by Defendant as a dark handgun. Leroy also described the weapon as dark.

At the end of the hearing, the State argued that the other crimes evidence "goes to show . . . proof of motive and [Defendant's] intent and that it wasn't an accident[.]" In both incidents, Defendant showed up at a drug deal "at a car with a gun." The State concluded that the other crimes evidence was classic 404(B) evidence.

Defense counsel agreed with the State "that the appearance of these allegations would be classic 404(B) evidence." However, defense counsel made the following argument to the trial court:

I think the prejudicial value, and honestly the credibility of these witnesses – the prejudicial value clearly outshines its relevance and its probativeness [sic] and the credibility of these alleged victims coming forward on the eve of trial three years later just does not lend credibility to their story, their internal consistencies that have been told in their story. I think it's strange credibility that if the alleged victim, [Sara], is

allegedly as injured as she is that she doesn't seek some medical treatment. There's no apparent sign of the scar.

I would note that she at least believes herself to be related to the alleged victim, Mr. Graves, in this case. It is clear that the defense in this case is self-defense. I think that it's strange credibility to believe that she would not have come forward until the eve of trial with this, and that she is doing so now so that she can intentionally torpedo the defense of [Defendant].

These are charges – or no police report has been filed. Even though the State has known about this now for almost a month, there still are no reports filed. Even though the State knew this was a first degree murder with witnesses who chose not to come forward for three years, they didn't record the statements. That's not, I think, excusable in this case, Your Honor, and it prevents the effective cross-examination of these witnesses in a very critical matter that the State knew was going to be 404(B), knew preparing for these interviews that it would be critical, and yet, neglected to do that.

Given all these factors, Your Honor, 404(B) evidence is something to help the State to prove its case, but it can't be done at the expense of defendant's fundamental right to a fair trial. The delay for three years of these witnesses to an alleged incident that was involving a relative, which they had to know about, it was clearly, if you believe them credible, them not coming forward has effectively prevented [Defendant] from putting them through the crucible of cross-examination, which is key in our society and in our system to ensuring a fair trial.

For those reasons, I would ask Your Honor to deny the State's motion to introduce this 404(B) evidence.

In response, the State noted that it contacted defense counsel on the day it interviewed Sara and arranged for defense counsel to interview her also. Defense counsel acknowledged the State's forthright communication but nonetheless complained of the lack of recordation of the statements made by Sara and Leroy and the lack of a report.

The trial court then ruled as follows:

With regard to the time in which this witness told her story, it's my understanding this witness never came forward. I know you indicated that this witness may be . . . related to the victim in the case. Had her motive been to torpedo the defendant's case, she would have come forward shortly after this defendant had been charged. She never came forward. The only reason the DA even found this material

17

witness was when their investigator interviewed [another potential witness]. . . . I don't want to say they stumbled – "they" being the district attorney's office – stumbled upon it. But frankly, this case was set for trial. Everybody was ready to go for trial, and the DA's office stumbled upon this from an interview with [another witness] after [that witness] said, "Yeah. This is what happened." And then they go out for the first time, at least from my understanding, and talk to [Sara]. She didn't come forward with her statement. She just told the investigator, "Yeah. This is what happened."

So I don't think that this was a plan or some sort of torpedoing of the defendant's case by [Sara]. And she never came forward. . . .

I do think it does prove opportunity, intent, plan, knowledge, or motive. In every other crime that the DA tries to introduce against a defendant's obviously prejudicial. I don't think in this case, however, the probative value is outweighed by the prejudicial value in this case. So, I'm going to allow it.

The matter then proceeded to trial. At trial, before any evidence was adduced, the trial court noted its previous ruling on the other crimes evidence and asked defense counsel if he wanted to object to the evidence out of the jury's presence. In response, Defense counsel provided a general objection without any further elaboration.

Now on appeal, Defendant asserts three arguments in support of his second assignment of error: the evidence of the offense against Sara was not sufficiently proven, did not address a genuine issue of material fact, and was not properly weighed by the trial court. However, the second argument—that the evidence of the offense against Sara did not address a genuine issue of material fact—is new and was not made in the proceedings below. So can Defendant raise this new argument for the first time on appeal? The answer to this question was given in *State v. Hypolite*, 13-1365 (La.App. 3 Cir. 5/14/14), 139 So.3d 687, *writ denied*, 14-1242 (La. 1/23/15), 159 So.3d 1056. In that case, this court explained as follows:

We find that Defendant is limited on appeal to challenging the trial court's admissibility of B.D.'s testimony on the basis raised in the trial court—that the prejudicial effect of the evidence outweighed its probative value. Defendant did not argue in the trial court that the rape

18

allegedly committed on B.D. was distinct from the rape committed on the present victim, nor did Defendant argue that B.D.'s veracity was questionable. It is well-settled that a defendant may not raise an argument on appeal that was not asserted in a contemporaneous objection at trial. La.Code Crim.P. art. 841. "This rule applies to instances where a party objected to the introduction of evidence at trial on one ground but either adds to or changes the basis for challenging the evidence on appeal." *State v. Landry*, 08–318, p. 6 (La.App. 3 Cir. 10/1/08), 2008 WL 4415697 (unpublished opinion) (citing *State v. Clayton*, 427 So.2d 827 (La.1982); *State v. Ford*, 349 So.2d 300 (La.1977)).

*Id*. at 701.

For these same reasons, Defendant is precluded from now raising the genuine-issue-of-material-fact argument. We now turn our attention to the two arguments that are properly before this court. Defendant initially contends that the admission of Sara's testimony was erroneous because the State failed to prove that Sara committed the offense against Sara. According to Defendant, there was no evidence that Sara was robbed: no police report, no firearm, no evidence of injury, and no eyewitness testimony at the hearing. We disagree.

In *Taylor*, 217 So.3d at 291 (emphasis in original), the supreme court addressed the burden of proof for admitting evidence under La.Code Evid. art. 404(B), holding that "the state need only make a showing of *sufficient* evidence to support a finding that the defendant committed the other crime, wrong, or act."

Put simply, since the testimony of one credible witness is sufficient to establish proof beyond a reasonable doubt, it is certainly enough to meet the "sufficient evidence" standard. In this case, Sara's testimony by itself was sufficient evidence to support a finding that Defendant committed the other crime.

Defendant's next and final argument is that the State failed to show that the probative value of the other crimes evidence outweighed its prejudicial impact. Again, we disagree.

19

In *State v. Brown*, 18-1999 (La. 9/30/21), 330 So.3d 199, *cert. denied*, 142 S.Ct. 1702 (2022), the supreme court held that the trial court acted within its discretion in determining that the probative value of the defendant's previous knife attack on a female acquaintance—in which he had pled guilty to a reduced charge of aggravated battery—outweighed its prejudicial effect in his subsequent capital murder trial for first-degree murder of a separate female victim. As the supreme court put it:

> Given the trial court's vast discretion in this regard, we find the trial court did not err in determining the probative value of this prior offense outweighed its prejudicial effect under La. C.E. art. 403. We agree the behavior exhibited by defendant in both cases is strikingly similar in that he reacted violently to two adult female victims who refused his sexual advances in the same manner by arming himself with a knife and stabbing both in the neck. . . . [T]he trial court did not abuse its discretion in finding the aggravated battery was relevant to establish defendant's motive and intent. Furthermore, even if the trial court erred in admitting the prior offense, the evidence of defendant's guilt in this case is sufficiently overwhelming to render this error harmless. *See State v. Johnson*, 94-1379, p. 17 (La. 11/27/95), 664 So.2d 94, 102 (holding that the introduction of inadmissible other crimes evidence results in a trial error subject to harmless error analysis). This assignment of error is without merit.

*Id*. at 237.

Like *Brown*, the behavior exhibited here by Defendant in both instances is strikingly similar in that Defendant reacted violently to two adult victims who were selling drugs by arming himself with a gun and using the gun to harm the victims. Defendant's attempted armed robbery of Sara is probative because it shows Defendant's motive for entering the current victim's vehicle with a gun and it shows Defendant's intent to rob the current victim during a drug deal—just like he did to Sara. The attempted armed robbery of Sara also contradicts Defendant's claim of self-defense.

On the other hand, Sara's testimony was not overly dramatic and was not likely to induce the jury to unfairly convict Defendant. Sara admitted to being a

drug user and dealer, so she was not presented as a totally innocent victim. In weighing Sara's credibility, the jury was able to consider her drug history, her relationship to the victim, and her failure to report the incident. In our view, Sara's testimony was not unduly prejudicial.

In sum, the trial court did not abuse its discretion in admitting the other crimes evidence. This assignment of error is without merit.

## III.   Third Assignment of Error

In his final assignment, Defendant asserts that two jurors became incompetent to serve after it was discovered that the victim's family member had previously worked with the jurors and that the family member had inappropriate contact with the jurors at the end of the first day of trial. The State, on the other hand, contends that the trial court's decision to allow the two jurors to continue to serve on the jury was not an abuse of discretion.

After opening arguments but before the first witness testified, the court noted that the State had been informed of the following:

> It's my understanding . . . that one juror, I'm assuming fist bumped – in response, touched or fist bumped one of the victim's family members. I don't know who it is or how closely related they are. And another juror was padded [sic] on the back by a victim's family member.

The trial court further noted that in reviewing the transcript of jury selection, neither party asked these jurors if they had any relationship with the victim. According to the trial court, it appeared that both gestures were initiated by the victim's family member and not by the jurors. Defense counsel nevertheless requested, and the State did not object, that the jurors be brought in for questioning.

The first juror, Christopher Carnline, explained that on the previous day, an individual named Spanky had initiated a fist bump with him. Juror Carnline described Spanky as a guy he used to work with. He denied knowing of any

21

relationship between Spanky and the victim. And he denied knowing the victim, Defendant, or any of the testifying witnesses.

Likewise, the second juror, Austin Cooley, explained that Spanky had also "stuck his hand out" and initiated a fist bump with him on the previous day. Juror Cooley noted that he knew Spanky through work but did not realize that he was a family member of the decedent.

Based on the above, defense counsel asked the trial court to remove the jurors, arguing as follows: "The fact that these gentlemen now know or had a work relationship with a victim's family member, which they now know, and had contact with him as they're leaving the courtroom, I think is prejudicial. And I would object to these two jurors being seated." The trial court overruled defense counsel's request, finding that "[t]here's no impropriety here at all. These two jurors stay."

On appeal, defense counsel initially abandons the argument that was made to the trial court, acknowledging an insufficient showing of prejudice to support a challenge for cause. Defense counsel's new argument, which is being made for the first time on appeal, is that Defendant should have been able to exercise two of his remaining peremptory challenges to remove the jurors. We disagree.

In short, Defendant is making an argument on appeal that he did not raise in the trial court. The argument is therefore not properly before this court. La.Code Crim.P. art. 841. But even if it was raised in the proceedings below, the trial court would not have been authorized to accept a peremptory challenge at that time. *See* La.Code Crim.P. art. 795(B)(1) ("Peremptory challenges shall be exercised prior to the swearing of the jury panel."). The jury panel here had already been sworn. There is no merit to this assignment.

22

## DISPOSITION

For the above reasons, Defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**